IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BYRON HOLMES<br><br>Plaintiff,<br><br>v.<br><br>GREENSTATE CREDIT UNION,<br><br>Defendant. | Civil Action No.<br><br>________________________ |

**COMPLAINT**

Plaintiff Byron Holmes, by his undersigned attorneys, for his Complaint against GreenState Credit Union, alleges as follows:

## NATURE OF THE ACTION

1. Mr. Holmes brings this action to redress the retaliatory and wrongful termination of his employment by his employer, GreenState Credit Union ("GreenState"). Mr. Holmes, who worked remotely for GreenState which is headquartered in Iowa, was terminated as a result of his complaints that GreenState had originated mortgage loans using false or non-existent credit scores which were then reported to the Unites States Government. The termination of Mr. Holmes' employment violated Iowa state law which prohibits employment terminations in violation of Iowa public policy.

## THE PARTIES

2. Plaintiff Byron Holmes is a resident of the State of Georgia, Gwinnett County. At all times during his employment with GreenState, Mr. Holmes resided in Georgia.

3. Defendant GreenState is an Iowa state-chartered credit union with its principal place of business located in North Liberty, Iowa. Upon information and belief, GreenState is the largest credit union in Iowa and serves members in Iowa, Illinois, South Dakota, Wisconsin, and Nebraska.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

5. Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

6. This Court has personal jurisdiction over GreenState because the cause of action arises from Mr. Holmes' employment in Georgia, and its actions caused Mr. Holmes to incur damages in Georgia.

## FACTS

**Mr. Holmes' Background**

7. Mr. Holmes has spent his entire professional career in the financial services industry. He began working in the financial services industry in 1993, selling and later trading what are known as "structured products" fixed-income securities to institutional investors for UBS Securities, LLC "UBS." UBS is a subsidiary of UBS AG, a publicly traded Swiss company which is one of the largest financial institutions in the world.

8. Structured products, in basic terms, are securities (typically debt) that consist of multiple assets whose value is typically linked to interest rates.

9. Relevant here is Mr. Holmes' experience in the creation and sale of mortgage asset-backed securities created by pooling loans and issuing marketable securities backed by the creditworthiness of those loans. In short, thousands of loans, such as automobile loans or home mortgage loans which have no or limited liquidity, are combined into marketable, income paying securities which are sold by the issuer to investors, most often via an investment bank. These securities are then sold to investors in tranches, with each tranche governed by specific rules for repayment. When the borrowers pay their loans, the investors receive the income in a hierarchy often known as a "waterfall," with the senior tranches being paid first, followed by subordinate tranches. Because the subordinate tranches in the waterfall

carry more repayment risk, the junior tranches offer investors higher interest rates than those offered to senior tranche investors, allowing each investor to choose its desired level of “risk/reward.”

**GreenState Hires Mr. Holmes**

10. In February 2023, GreenState hired Mr. Holmes with the title Director of Capital Markets. The hiring of Mr. Holmes was, among other things, in anticipation of GreenState bringing to market its first ever securitization transaction in March 2023 of approximately $400 million in automobile loans it had made to its credit union members (the “Auto Loan Transaction”).

11. At the time, GreenState had no or virtually no in-house expertise with respect to securitizations of loans or even fixed income markets (GreenState at the time did not even have a bond portfolio). GreenState, being dependent on its outside underwriter for advice, wanted Mr. Holmes to quickly familiarize himself with the Auto Loan Transaction and work with the underwriter on all aspects of its execution (from structuring to sales), as well as to draft a securitization policy for GreenState.

**Mr. Holmes Learns that Contrary to its Representations, GreenState did not have Verifiable Credit Scores for the Borrowers for Many of its Automobile Loans**

12. As Mr. Holmes became familiar with the Auto Loan Transaction, he learned that contrary to the deal documentation which would be provided to potential

investors, that many of the automobile loans included in the deal did not have verifiable credit scores for the individual borrowers.

13. The lack of verifiable credit scores underlying the automobile loans was alarming to Mr. Holmes for at least two reasons.

14. First, inflated or outright fake creditworthiness for “sub-prime” borrowers was a prime underlying cause of the 2008 credit meltdown resulting in what is often called the Great Recession, the worst financial disaster in the United States since the Great Depression. Having had a front row seat to the events leading to and in the aftermath of the 2008 meltdown, Mr. Holmes wanted no part in a transaction that had the same or similar problems.

15. Second, Mr. Holmes knew that if he became involved in the Auto Loan Transaction, that he would likely be the person required to sign the representations and warranties in the disclosures made to the United States Securities and Exchange Commission.

16. At a Board of Directors Meeting the week of April 17, 2023, the topic of the credit scores in the Auto Loan Transaction was raised by a GreenState board member. During the meeting, Mr. Holmes listened to discussions concerning the fact that there had been an internal whistleblower with respect to this issue, but that as of that time GreenState had not followed up.

17. Outside counsel was either during the Board of Directors meeting or very shortly thereafter engaged to investigate. In early September 2023, GreenState publicly announced that its longtime Chief Executive Officer, and several other senior executives were suddenly departing. Upon information and belief, the CEO was granted the option to either retire or be immediately terminated for cause, by the board, as a result of the aforementioned investigation, and he chose to retire.

18. The Auto Loan Transaction, an approximately $400 million securitization, finally was issued in March 2024.

**The Lingering Problem with the GreenState's Automobile Loans**

19. The Auto Loan Transaction was not GreenState's only transaction concerning automobile loans with the aforementioned credit rating problem. Prior to the commencement of Mr. Holmes' employment, GreenState had engaged in several transactions that are known in the industry as a "loan participation" transaction.

20. Simply-put, a loan participation is a transaction in which a depository institution (most often a credit union) enters into an agreement to share the risks and the proceeds of a loan or group of loans with one or more other depositories. In such a transaction, the institution that originated the loans seeks to sell a portion of them to the other institutions according to negotiated terms and price. The originating institution retains full rights and responsibilities

for all interactions with the borrower(s) (collecting payments, imposing late fees, fielding borrower inquiries, etc.).

21. Many of these loan participations suffered from the same credit rating problem as noted above. Accordingly, Mr. Holmes recommended that GreenState inform the purchasers in the loan participations and offer them the opportunity to unwind the transactions – GreenState would buy back the problem loans.

22. Upon information and belief, while GreenState did notify some of the purchasers, it did not inform all of them.

**Mr. Holmes Discovers Credit Score Problems in GreenState's Mortgage Business**

23. In December 2023, as part of an effort to securitize, sell, or participate GreenState's home loans as part of a mandate to increase GreenState's liquidity, Mr. Holmes tasked a GreenState independent contractor to work on analytics for GreenState's mortgage loan portfolio. As part of this work, the contractor discovered that on numerous occasions credit scores with respect to home loans originated by GreenState appeared in one database but not another.

24. The discrepancy was highly troubling for at least several reasons. First, the nature of the issue bore a striking resemblance to the Auto Loan Transaction problems and the loan participation problem, but potentially more serious.

25. Second, as the mortgage originator, GreenState was required to report certain data regarding each individual loan to the federal government pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. §§2801-2811 ("HMDA"). If this data was later found to be incorrect for a significant number of loans, then GreenState had a duty to inform the federal government.

26. Third, Mr. Holmes was concerned that he would be required to certify to potential buyers that the loan data was accurate, much as in the same manner that he had concerns about representing the truthfulness of the auto loans in the Auto Loan Transaction.

27. Fourth, the most likely explanation for the discrepancy was not an occasional error, but rather a deliberate failure to report an accurate (or missing) credit score. In short, it appeared these improper practices were pervasive throughout all of GreenState's lending businesses.

28. Mr. Holmes promptly reported it to GreenState's interim Chief Executive Officer (the search to replace the recently departed CEO was still ongoing). The interim CEO instructed Mr. Holmes to meet with GreenState's mortgage team to discuss the issue, and Mr. Holmes thus reached out to the head of GreenState mortgage originations, who denied there was a problem.

29. Mr. Holmes then met with the mortgage team, the contractor, the interim Chief Financial Officer (Mr. Holmes' direct supervisor), and the Vice

President of Finance and Analytics. To Mr. Holmes' knowledge, the issue was not followed up on by GreenState. Mr. Holmes continued to regularly raise the issue with his superiors over the next year, including with GreenState's general counsel. He also continued to raise the issue of the loan participation buy backs.

30. Mr. Holmes finally received feedback regarding his repeatedly raised concerns in or around May 2025 – nearly a year and a half later. His supervisor (the CFO who was no longer "interim") informed him that an investigation was conducted into his concerns, and that no significant issue had been uncovered. Upon further discussion, Mr. Holmes then understood that the scope of the investigation covered only loans issued *after* corrective actions were taken in response to the whistleblower's complaint with respect to the Auto Loan Transaction -- i.e. likely 2023 and forward -- because it was too much of a burden to verify the earlier loan data.

31. Upon hearing the results of the investigation and the explanation for its limited scope, Mr. Holmes immediately expressed his astonishment. First, it was more than a bit odd that such data was too laborious to verify.

32. Second, the timing was inherently suspicious. The problematic loans underlying the Auto Loan Transaction dated from 2022 and earlier. After that scandal resulted in the departure of GreenState's CEO, it was inconceivable that

home loans coinciding in time with the problematic automobile loans were not reviewed.

33. Third, regardless of any alleged inconvenience in reviewing home loans coinciding in time with the problematic automobile loans, GreenState had a duty to report to the federal government significant incorrect data. Because GreenState had already acknowledged that the auto loan data was not accurate, it was imperative to not mislead the federal government (and potential future investors in any securitization, loan sale, or loan participation) by purposely limiting the investigation to a time after the conduct underlying the auto loan scandal had been discovered and remedied.

34. Upon information and belief, GreenState had multiple strong motives for engineering an investigation that would be pre-determined to find no wrongdoing. For example, at the time GreenState's automobile loan origination business had been greatly diminished since the latter half of 2023 due to a strategic business decision that backfired (not relating to securitization). As a result, GreenState was ever more reliant on its home loan origination business.

35. Upon information and belief, another strong motivating factor was GreenState's liquidity. In November 2023 Mr. Holmes attended a meeting with one of GreenState's regulators, the Iowa Division of Credit Unions ("IDCU"), to discuss the results of its most examination of GreenState. Among the IDCU's significant

concerns was that GreenState had a decreased level of regulatory capital, and it directed GreenState to prepare a comprehensive capital plan. In the meeting the IDCU was supportive of GreenState engaging in securitizations of its loans (the sale of which would increase the credit union's capital and/or liquidity).

36. The regulators were correct to be concerned. GreenState thereafter reported that it lost $73 million in the last quarter of 2023, and nearly $83 million for all of 2023.

37. Upon information and belief, another strong motivating factor was GreenState had recently been on "thin ice" for alleged prior HMDA violations and had been at risk of having been subject to the suspension of making new residential home loans. While upon information and belief GreenState did not ultimately face any sanction, a credit reporting scandal analogous to the roots of the 2008 financial crisis, particularly in the wake of a loss-making year in significant part due to loan defaults, would have had significant adverse consequences.

38. Upon information and belief, another strong motivating factor was that in November of 2024, GreenState's subordinated debt (not related to securitization transactions) was downgraded to junk status, a rare occurrence for credit unions. GreenState relied upon this debt as part of its capital base. Junk status would likely have future significant effects on GreenState's capital base and its cost of raising future capital.

**Mr. Holmes is Terminated**

39. From the time in or about May 2025 when Mr. Holmes learned of the result of GreenState's truncated investigation into the credit ratings of its home loans as reported to the federal government and his pushback on the pre-determined investigatory outcome, Mr. Holmes was increasingly isolated from his direct supervisor.

40. During the month of June 2025, Mr. Holmes took his annual month-long trip to Japan, a trip he took every year while employed at GreenState and was a negotiated term of his hiring. While in the past he worked remotely from Japan, this time Mr. Holmes was prohibited from accessing the GreenState computer system (even though he continued to receive his regular pay). Upon his return, Mr. Holmes was surprised to see that upon logging into his corporate email (which he was prohibited from doing while in Japan), his direct supervisor had not sent him a single email.

41. On September 9, 2025 Mr. Holmes was summoned to an unscheduled video conference with his supervisor (the CFO), general counsel, and a representative from human resources. He was informed that he was terminated, effective immediately.

**<u>AS AND FOR A FIRST CAUSE OF ACTION</u>**

(Retaliatory Termination in Violation of Iowa Public Policy)

42. Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1-41 above as if set forth fully herein.

43. Iowa has a clearly defined and well-recognized public policy that protected Plaintiff's complaints (whistleblowing) regarding the credit reporting with respect to Defendant's home loans. Iowa recognizes a common law tort for wrongful or retaliatory discharge where an employer terminates an at-will employee in violation of a clearly defined and well-recognized public policy of the State of Iowa. *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988) (en banc); *Springer v. Weeks & Leo Co.*, 475 N.W.2d 630, 632 (Iowa 1991). Iowa's public policy is clearly defined and well-recognized with respect to Plaintiff's complaints regarding the credit reporting practices concerning Defendant's home loans, including the reporting obligations imposed by the HMDA, and Defendant's disclosure obligations to federal regulators and investors.

44. Iowa's public policy is undermined by Plaintiff's termination, in that Defendant's conduct in terminating Plaintiff for raising these concerns discourages employees from reporting conduct that jeopardizes the accuracy of information relied upon by federal regulators, investors, and the public.

45. Plaintiff engaged in protected activity by raising his complaints regarding the credit reporting practices with respect to Defendant's home loans to

Defendant's interim Chief Executive Officer, Chief Financial Officer, and General Counsel, among others, and Plaintiff's conduct in this regard was a determining factor in, and proximate cause of, Defendant's decision to terminate his employment.

46. Defendant had no overriding business justification for terminating Plaintiff. Defendant terminated Plaintiff as retaliation for, and in an attempt to silence, Plaintiff's complaints regarding the issues he raised with respect to the home loan securitization and Defendant's HMDA reporting obligations. A plaintiff asserting a claim for wrongful discharge in violation of public policy is not required to disprove an overriding business justification as part of his prima facie case; rather, the absence of such a justification, or the pretextual nature of any proffered justification, is properly considered as part of the causation analysis. *See Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 899 (Iowa June 30, 2015).

47. As a result of the forgoing, Plaintiff is entitled to damages. for lost past and future earnings, emotional distress, and other consequential damages recoverable under Iowa law for wrongful or retaliatory discharge. *Springer*, 475 N.W.2d at 634–35 (lost wages and emotional distress damages are recoverable as part of an employee's complete injury in a wrongful discharge claim). Plaintiff's damages exceed $75,000 exclusive of interest and costs, as Mr. Holmes has not found employment in his field of work since his termination and his annual compensation exceeded $150,000 per year.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A. Compensatory and other damages in amounts to be determined at trial;

B. Punitive damages;

C. Attorneys' fees and costs;

D. Interest; and

E. Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted this 21st day of September, 2026.

**BARRETT & FARAHANY**

s/ *Jean C. Abreu*
Jean C. Abreu
Georgia Bar No. 575723
2921 Piedmont Road, NE
Atlanta, GA 30305
(404) 777-1782

**RASCO KLOCK LLC**

s/ *Blaine Bortnick*
Blaine Bortnick
260 Madison Avenue, 16th Floor
New York, New York 10016
(646) 970-4770
*Counsel for Plaintiff*